**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 99-30901
_____


ELLIS N. RATCLIFF, SR.; FRANCES MAE TAYLOR,

Plaintiffs - Appellants,

VERSUS

WILLIS M. DANIEL, ET AL,

Defendants,

WILLIS M. DANIEL; SCOTT BRAUD; RANDALL W. METZ; STEVEN D. NEAL;
SPHERE DRAKE INS, PLC,

Defendants - Appellees.

_____

Appeal from the United States District Court
For the Middle District of Louisiana
(96-CV-24)
June 29, 2000

Before DAVIS, DUHÉ, and DENNIS, Circuit Judges.

DUHÉ, Circuit Judge:[1]

Plaintiffs-Appellants Ellis Ratcliff, Sr. and Frances Mae Taylor (the "Appellants"), the parents of Ellis Ratcliff, Jr. ("Ratcliff") brought this Louisiana wrongful death and survivor action against Defendants-Appellees William Daniel, Scott Braud, Randall Metz, Steven Neal, and Sphere Drake Insurance (collectively, the "Appellees"), after Ratcliff died while

_____

[1]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

imprisoned at West Feliciana Parish Jail.  The district court granted summary judgment in favor of the Appellees.  We reverse and remand.

### FACTUAL BACKGROUND

On a Friday, Ratcliff borrowed a friend's car to drive from Baton Rouge to St. Francisville, La. to assist his family in preparing for his grandmother's funeral.  En route back to Baton Rouge, a West Feliciana Parish Sheriff's Deputy discovered that Ratcliff was driving a stolen car and pulled him over.  Deputy Scott Braud ("Braud") booked Ratcliff at the parish jail. Ratcliff was upset and crying during the booking, apparently at the prospect of missing his grandmother's funeral the next day.  While Braud did not indicate on the booking paperwork that Ratcliff posed a suicide threat, Braud called Sheriff William Daniel ("Daniel") to ask where to put Ratcliff.  Daniel directed that Ratcliff be dressed in a prison jumpsuit and placed in the "detox" cell.  Daniel also directed Braud and Deputy Steven Neal ("Neal") to keep a very close eye on Ratcliff.  The detox cell is the cell closest to the jail control room and is in a location where the deputies can continuously monitor the resident inmate.

Ratcliff spent Friday night in the detox cell.  On Saturday, Ratcliff asked Deputy Daigle ("Daigle") if he could go to his grandmother's funeral.  Daigle contacted the Sheriff who stated that, due to the seriousness of the charges, such a trip would not be possible.  By Saturday morning, Ratcliff had apparently stopped crying but, according to Daigle, seemed somewhat upset.  Later on

2

Saturday, Ratcliff was moved from the detox cell to cell D. Cell D is more isolated than the detox cell, and the deputies can not continuously watch an inmate housed in cell D. At all relevant times, Ratcliff was the only inmate in cell D. A number of other inmates stated, in deposition testimony, that they observed Ratcliff crying and upset off and on during Saturday.

About 3 p.m. on Saturday, Ratcliff was taken to the "lawyer's room" at the jail for interrogation by Deputy Randall Metz ("Metz"). During the interrogation, Ratcliff asked Metz if he could be released to go to his grandmother's funeral and Metz agreed to ask the Sheriff. Ratcliff was returned to cell D by Metz sometime between 4-4:30 p.m.

In his deposition testimony, inmate John Hubbard ("Hubbard") stated that he saw something white flash in Ratcliff's cell about 4:20 p.m. Hubbard stated that, given how upset Ratcliff seemed, he thought Ratcliff might have hanged himself, but he alerted no one. About 4:35 p.m., inmate Isaac Washington allegedly heard a beating sound in one of the other cells. He testified that he hollered to find out what was going on but got no response. Around 4:40 p.m., an inmate, who was passing out dinner, found Ratcliff hanging from a bed sheet in cell D.

Deputies on the scene attempted to revive Ratcliff but to no avail. That evening Dr. Emil Laga ("Laga") performed a coroner's autopsy on Ratcliff. His report listed the cause of death as "acute asphyxiation, possibly resulting from hanging," but the mode of death was listed as "undetermined, pending further

investigation." At the time of the autopsy, Laga did not have access to the sheet with which Ratcliff allegedly hanged himself.

At the request of Ratcliff's family, Dr. Alfredo Suarez ("Suarez") examined Ratcliff's body. Suarez found that the ligature mark on Ratcliff's neck was a quarter inch wide, and that the mark had a braided pattern. Suarez concluded that the markings were most likely caused by a braided rope or cord, not a bed sheet. Suarez also noted that, in a hanging, the ligature mark usually runs in an upward "V" pattern across the neck, whereas the mark on Ratcliff's neck was horizontal - as if Ratcliff had been strangled from behind. Suarez concluded that the injuries on Ratcliff were more consistent with strangulation by a rope or cord than a hanging with bed sheets. In his deposition, Suarez concluded that Ratcliff's death was most likely the result of a homicide.

When Laga finally obtained the sheet with which Ratlciff had allegedly hanged himself, he noticed that the sheet could not be twisted in such a manner that would leave a mark as narrow as that on Ratcliff's neck. Furthermore, the sheet did not have any blood or vomit stains, which was unusual. He also noted that a bed sheet would not leave such a distinctive braided pattern. Laga further noted that hanging by a bed sheet normally would leave a circumferential ligature mark and a bruise on the back of the neck where the sheet was tied. On Ratcliff the ligature mark ended abruptly and there was no knot imprint. Like Suarez, Laga concluded that it was unlikely Ratcliff had died by hanging himself with a bed sheet.

4

## PROCEEDINGS

The Appellants initially brought a 42 U.S.C. § 1983 action against the Appellees. The district court granted Appellees' motion for summary judgment, and the decision was upheld without substantive comment by this court. See Ratcliff v. Daniel, No. 95-30654 (5th Cir. April 9, 1996).

Appellants then filed this wrongful death and survivor action. In this action, they advance two theories of liability against the Defendants. First, they contend that Ratcliff was either killed by one or more of the Appellees, or by someone given access to Ratcliff by the Appellees. Under this theory, Appellants claim that the Appellees are liable for negligently failing to protect Ratcliff from harm. Alternatively, Appellants contend that Ratcliff may have committed suicide. Under the second theory, Appellants contend that the Appellees were negligent in failing to monitor Ratcliff and take steps to prevent him from committing suicide.

The Appellees moved for summary judgment, and their motion was referred to a magistrate judge. The magistrate judge's report and recommendation determined that there were a number of genuine issues of material fact in dispute, and therefore the motion should be denied. The district court originally agreed with the magistrate's report and denied the motion for summary judgment. Seven months later, however, the district court, acting on its own motion, decided to reconsider its earlier decision denying the Appellees' motion.

After a hearing on the matter, the district court granted Appellees' motion for summary judgment. Regarding the Appellants' strangulation claim, The court concluded that "there is absolutely no evidence in the record that any of the named defendants strangled the decedent." Nor, the court held, was there evidence that the Appellees had given someone other than the named Defendants access to Ratcliff. With regard to Appellees' failure to protect Ratcliff from self-inflicted injury, the court concluded that there was no evidence in the record indicating the Appellees had reason to believe that Ratcliff was suicidal.

**DISCUSSION**

We review a grant of summary judgment de novo, viewing the facts and inferences in the light most favorable to the party opposing the motion. See Hall v. Gillman, Inc., 81 F.3d 35, 36-37 (5th Cir. 1996). Summary judgment is appropriate if the record discloses "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Courts must also determine whether an inference or circumstantial evidence might suffice to create a factual dispute. Fontenot v. Upjohn Co., 780 F.2d 1190, 1195 (5th Cir. 1986). The district court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).

We first note that the Appellants make only negligence claims

6

before this court and not intentional tort claims: (1) They claim the Appellees are liable for negligently failing to protect Ratcliff from harm; (2) they claim that Appellees are negligent in failing to monitor Ratcliff and failing to prevent him from committing suicide. A plaintiff may prove a negligence claim through circumstantial evidence. See Cangelosi v. Our lady of the Lake Req'l Med. Ctr., 564 So.2d 654, 664 (La. 1989) (The Louisiana Supreme Court held that in a circumstantial evidence case the plaintiff must produce evidence from which the factfinder can reasonably conclude that his injuries, more probably than not, were caused by the negligence of a particular defendant. "The plaintiff, however, does not have to conclusively exclude all other possible explanations for his injuries, because the standard is not proof beyond a reasonable doubt.").

As we noted, circumstantial evidence taken as a whole is often sufficient to produce an issue of material fact and therefore make summary judgment unnecessary. We find that to be the situation in this case. The testimony of the two doctors certainly produces an issue of material fact as to whether the Appellees negligently failed to protect Ratcliff from harm by others than himself. The testimony of the deputies and inmates stating that Ratcliff was upset and unhappy creates an issue of material fact as to whether the Appellees were negligent in failing to monitor Ratcliff to protect him from harming himself. This is not a case that should be disposed of through summary judgment. In a case like this, the jury is free to believe or not to believe and to choose among the

circumstantial evidence presented.  The district court on summary judgment cannot accept some evidence and reject other evidence, but a jury can.

For these reasons, we reverse the district court and remand.

REVERSED and REMANDED.